on behalf of Ms. Munoz. I think this would be a pretty pedestrian appeal of the jury instruction issue in this case, except for two things. The first thing is, is that the government in this case, at 50 of the excerpt of record, specifically disavowed an aiding and abetting theory. And that's key because the second part of the district court's jury instruction on financial gain was effectively tailored for an aiding and abetting type situation. The district court told the jury that it doesn't matter whether or not Ms. Munoz was to receive the financial gain. That probably would be fine in a case where there was an aiding and abetting theory. But the government disavowed that sort of theory. And I think that this court's decision in Sai makes clear that if the government wants to rely on the intent for someone else to gain, that it has to go by way of an aiding and abetting theory. And I think that the crucial passage from Sai reads, because Sai was charged as an aider and abetter under 18 U.S.C. Section 2, the government could not make out this principle merely by proving that a principal, not necessarily Sai himself, committed the crime with a pecuniary motive. It need not show actual payment or even an agreement to pay. So Sai acknowledges that when you're going by an aiding and abetting theory, it doesn't matter whether or not the defendant was to receive the payment. But here, the government specifically disavowed that. So under Sai, this sort of derivative liability where they can rely on someone else's intent is unavailable. Suppose we agree with you. Would we look at the instructional error in the sense of structural error or for harmless error review? I think it would be a structural error because I think the two main cases are Nieder and Brasidas-Oliveri. Those are both cases where there are two circumstances that the errors shared. Number one is that it was an error that went to an element that was effectively uncontested. And number two, it was a single element. Here, I concede that we were talking about a single element. The question is, is whether or not it was disputed. And the answer, I think, is that it clearly was disputed. And it was disputed not in the arguments because the district court's instruction effectively took that argument away. It was disputed in the context of the arguments over the instructions. And I've cited in the excerpt of record, there was an extended discussion on this point. Defense counsel at trial fought very hard to get the district court to delete that instruction. And if I direct the court to an excerpt of record at pages 58 to 59 and 63 to 69, those are the pages where defense counsel was fighting against the instruction that the district court actually gave. And, you know, the government points out, and they're right about this, that there was not argument from defense counsel in closing on this point. But our response to that is, is that when the district court gives an instruction and there's extensive discussion about that instruction and the district court rules against you, that I don't think to preserve the error that you need to, you know, defy the district court's ruling and then go and argue something that's contrary to the instruction. So our position is, is that this was contested, so this doesn't come within the Nieder and Grassides-Ulibarri exception to the structural error that would otherwise be required here, because effectively what we're talking about is the lack of a jury finding on a particular element. And I think that the test that this Court should employ in determining whether or not that's the case is the case set out, the test set out in the McNeil case. If there's a reasonable possibility that the jury would have read this instruction to delete that element, then it's effectively a constitutional error. An absent application of Nieder and Grassides-Ulibarri is a structural error. Now, I think even if Your Honors just apply the harmless beyond a reasonable doubt, I think that there's enough evidence in this record. You know, the evidence shows that the aliens gave their money to a man, a male smuggler was the individual they paid. And that's at page 32 to 33 of the excerpt of record. And I totaled it up. I think they paid about $4,700 to that individual. And that's at excerpt of record 33. And there's no evidence in the record linking anything approaching that amount of money to Ms. Munoz. So I think that even if Your Honors apply a harmless beyond a reasonable doubt standard to this particular error, it would still be a situation where a reversal would be required. But effectively, I think the most important thing, and I think it's very similar to the analysis in Powell v. Galazza, that Ms. Munoz was denied a jury finding on this fact. And this is the crucial fact in the case. I mean, really, that's what determines whether or not the minimum mandatory applied. You know, the district court gave her 21 months on the non-minimum mandatory counts and 36 months on the mandatory counts. So this is really the most important thing in this case to her. So I think that the Grassides-Ulibarri-Nieder exception shouldn't apply here. If Your Honors don't have any other questions on that issue, I'd like to touch briefly on the second issue. But I would like to address any concerns the Court has as to the issue, the first issue. All right. I'll move on then. The second issue relates to this whole group of amendments that were made to the statute. Effectively, before these amendments, the case where there's no actual entry to the United States, the statute was amended so that it would cover pre-entry activities. And I think particularly as to counts one and three, it's important to bear in mind that this statute, as it's written, can apply to conduct that precedes the entry, and arguably doesn't even necessarily have to be at the port of entry. I've had cases where there's been activity outside of the port of entry. And I think that that's why it's important for there to be the, there has to be a nexus between the lack of consent and the actual conduct. So when Congress amended the statute to apply this statute to pre-entry conduct, it also amended the statute to say that the alien might have lacked the permission to come to the United States. And this Court has been very clear that brings to and comes to are different than the former language that was used, comes into and brings into and entry. So I think that when Congress added those things, they effectively added them together. And that's why I think the evidence is insufficient, because they never proved that for this pre-entry conduct that there actually was any evidence that these aliens lacked permission to come to the United States. You're saying it's a failure of proof. Yes. Of the prior authorization. That's exactly right. The testimony in trial was the aliens didn't have permission to enter, but that testimony didn't address whether or not they had permission to come to. Why do you need, Sam, this is hard for me to grasp. Why do you need, what does come to mean, first of all? To actually come up to the border? That's what I think. I think comes to. What does it mean, to come to the border? The statute doesn't define the term. Well, what do you think it means? I think it means activity related to trying. I'm not speaking of the act. I asked you, what do you think come to means? Right. I think it means things short of entry, coming to the border. Come right up to the border? Yes. Well, it's not illegal to come up to the border, is it? It's not, but. Why do you need permission? Well, I think that's an excellent question. I think maybe the AG should have promulgated regulations about when you can and can't come to. But I think that Congress is the one that inserted this comes to provision into the statute. So they must have meant something. So I'm assuming that they must have meant that you need permission under this statute in order to bring people to the border. And I don't know how you get that permission. The government makes that point in their brief. They don't know either. But that's the statute that Congress has left us with. If it doesn't mean anything, if they have created this comes to provision that doesn't make any sense, then I think that what should happen now is what happened before. It should go back to the drawing board. I think Congress could have fixed the problem that it had in this statute initially by changing, by saying if you bring into or attempt to bring into, that that's a crime. But they chose not to do that. They added this brings to, which has generated a tremendous amount of litigation. This Court has held that brings to applies before you enter. It applies after you enter. And it even applies under Angwin until you reach your immediate destination. So these are very amorphous terms. And I think if there's any ambiguity in them, then that works against the government. I think I have about a minute for rebuttal if I have to reserve that. Roberts. Good morning. May it please the Court, the response to the United States. The government wouldn't concede that there was not an entry in this case. And this particular statute was. Say that again. You mean there was an entry in this case? Certainly there could have been. Yes. They did cross the actual border. They were not under the aliens themselves were not under official restraint. The officials didn't even know they were there. So in that sense, they made an entry. The defendant didn't make an entry. That's not what you argue in your brief, is it? No. But I would say. So you're changing your argument. Well, I would just say we're not conceding that. But even assuming that defense is right, that this is a come-to case, first of all, the statute is disjunctive. Don't have to prove. We can prove any one of the three elements, not don't have to prove one of those. But this doctrine, the doctrine of official restraint, came about very formalistically to because of a certain type of definition of entry. And that is where people don't really enter the country as long as they are under control of the government. In this case, and in the Mario Bolt case. What do you think come-to means? I think come-to means walk up to the border. You can even walk up right to the inspector and say. And if you don't have the right to come to the country, you can say I'm from another country. I don't have the right to be here. There's no violation. But what does it mean? Why is it there? It's pretty clear why it's there. Congress wanted to make sure that people who brought other people to the border could be punished. What do you mean by to the border? Right up to the border? Right. For example, in the Mario Bolt case, they brought people right up to the border. Now, is it conceivable they might have had permission to come to? Well, given the odd and formalistic official restraint doctrine, yes. For example, there might have been a parole letter. Say someone is paroled in to testify. They never make an entry for purposes of immigration. So it's conceivable maybe under those circumstances where they actually bring them to the border, let them walk up and ask for asylum, you might have to prove no authorization to come to. That's not the situation we have here. We have people hidden in a compartment. They aren't in view. The government doesn't even know they're there. They have no permission. Clearly, they meant to come and enter the United States. But they didn't enter. Pardon? They did not enter. Well, I wouldn't concede that. I would think that they did enter, given that. But even if they didn't, they had no permission to be there. And it's obvious from the fact that they're hidden, that there's no permission they could have had. And, frankly, there's nothing that — well, there's no permission they could have gotten. The kind of permission that defense wants to put on this is a permission that you have anyway. So, really, you have to look at the sort of confused context in which this statute arose. That is, with the Mario Boltlev case and the fact that they brought them to the border and then had them come in and claim asylum. It's that situation that the come-to was meant to get after, not a situation where someone's hidden away from officials, clearly attempting to illegally enter the United States. But that's not the charge here, right? Attempting to illegally enter. No, the charge isn't attempting. But the aliens themselves, the charge is smuggling. That's against the defendant. But if we're going to look at the aliens in terms of entry, that's certainly what they were doing. They were coming and they were entering. As to the defendant, no. As to the aliens, I think yes. And the only thing I would point out as far as the first argument is, number one, the side case simply said that in that situation where there's aiding and abetting, you don't have to say they personally gained. It didn't say in another situation you must. And, in fact, there, they said, you know, where there's overwhelming evidence of any other explanation, then that's what's happened. And that's what we have here. We have clearly payment. The person did it for the purpose. They don't have to receive it themselves as the copyright examples make clear with the very same language. For example. That goes to the I guess maybe the sufficiency of the proof or to the harmlessness if there was error. But the question is, was it error to give that instruction? No, I don't believe it was error to give that instruction. And that is based on the cases that have already interpreted that language. For example, the copyright cases that the government points out in its brief. That is where, for example, the person worked in a video store and made copies to sell. The person, that person, the employee, didn't receive any gain themselves. But it was done for the purpose of commercial advantage or private financial gain. That's what's done here. There's clearly payment. And there's no other explanation. It's not a family. It's not a friend. That's what this is getting at. Is, you know, they want to make sure that a person isn't subjected to a mandatory minimum who might have brought a friend or a family member or somebody like that. Here there's no suggestion. In fact, that would be inconsistent with the defense that was offered. That defense is no knowledge. They couldn't have argued. Even if they'd gotten their instruction, they couldn't have. What would they have argued? I didn't know they were there. But if I did, I was going to do it out of the kindness of my heart? I don't think so. It's logically they couldn't have made that argument. So I think that here, that instruction fits well within the law. Even if it didn't, it's certainly harmless beyond a reasonable doubt, given that there's any other circumstances that might explain it. With that, unless there are any further questions. No? No. Thank you very much, Counsel. I was first asked to the copyright cases. Those are completely irrelevant. The Cross case, and that's at 816 Fed Second at page 301, is a conspiracy case. So, again, in that case we're talking about derivative liability. The Stolon case is the other case, the other copyright case. That case is also irrelevant. That's an aiding and abetting case. There's actually an explicit aiding and abetting instruction in that case. And that's at page 240 of the opinion at 555 F. Sub. With respect to the evidence in this case, I think Judge Teshim's question points out that the evidence in the case isn't relevant to whether or not the jury was properly instructed. It could be relevant if Your Honors do conduct a harmless beyond a reasonable doubt analysis, rather than the structural error analysis that I think is compelled by Powell v. Galazza. With respect to the government's reading of Sai, I think the government misses the first word of the sentence. The first word of the sentence is because. Sai says because the government relied on an aiding and abetting theory, then they got to use the intent of other individuals. That's the difference between that case and this case, where the government has explicitly disavowed an aiding and abetting approach. So I think under those circumstances, none of the government's rebuttal in any way detracts from the argument. I'm out of time, so I'll submit unless Your Honors have any questions. Any questions? Thank you. Thank you, Your Honor. All right. The case of U.S. v. Munoz is submitted. And we'll hear U.S. v. Iskara-Pardini. Thank you.
judges: Tashima, Wardlaw, Collins